### HAWKINS et al. v. MERRILL, LYNCH, PIERCE, FENNER & BEANE.

### Civ. No. 833.

United States District Court
W. D. Arkansas, Fort Smith Division.

July 20, 1949.

Bland, Kincannon & Bethell, Fort Smith, Arkansas, for plaintiffs.

Hardin, Barton & Shaw, Fort Smith, Arkansas, for defendants.

### Statement

JOHN E. MILLER, District Judge.

Plaintiffs filed their complaint on April 11, 1949, alleging that the defendants are liable to them as a result of losses occasioned in the purchase of stock through D. S. Waddy, doing business as D. S. Waddy & Company, alleged to be the agent of and under the control of the defendants.

Defendants filed their answer May 7, 1949, denying that they are liable for the losses, and denying that D. S. Waddy was their agent or under their control.

The cause was tried to the Court, without the intervention of a jury, on June 28, 29, 30 and July 1, 1949. At the conclusion of the introduction of testimony, the par-

ties were granted time within which to file briefs in support of their contentions. Briefs have been filed and considered along with the pleadings, the ore tenus testimony and exhibits thereto and stipulations, from all of which the Court makes and files herein the following findings of fact and conclusions of law separately stated:

### Findings of Fact

1. Plaintiffs' claim is based upon alleged violations of Sections 78j, and regulations thereunder, 78k(d), 78q(a), and regulations thereunder (specifically Rule X-17A-5), and 78t(a) of Title 15 U.S.C.A., The Securities Exchange Act of 1934.

The plaintiffs, R. P. Hawkins, J. K. Fraser, Rose Goodman, Raymond Allen, C. R. Sadler and C. W. Schacht, are citizens and residents of the State of Arkansas.

The defendants, Merrill, Lynch, Pierce, Fenner & Beane, are partners and are engaged in the brokerage business. They are members of the New York Stock Exchange and other principal stock and commodity exchanges throughout the United States. Their principal place of business is located at 70 Pine Street, New York, New York, but maintain branch offices at Hot Springs and Little Rock in the State of Arkansas; and at all times involved herein were transacting business in the Western District of Arkansas under the supervision and control of the Arkansas State Banking Department. Defendants, as one of the major brokerage firms in the United States, have a national organization with ninety-eight branch offices and twelve wire connections or correspondents in various cities. They perform the usual functions of a brokerage firm, including the purchase and sale of stocks, bonds, securities and commodities for their customers and the maintenance of a research department to correlate and distribute pertinent information as to the status and financial structure of corporations that have stock, bonds, and securities on the market, which information is a necessary basis for advice given to prospective investors. Their compensation is derived from commissions charged to their customers for the services performed.

2. The firm of defendants was organized and has been in existence with its present general partners since August 18, 1941. At that time defendants took over the facilities, accounts and business of the partnership of Fenner & Beane. The latter firm, or more specifically the persons comprising it, have been engaged in the brokerage business for a number of years, but it is necessary to consider D. S. Waddy's connection or status since 1932, only. Waddy, trading as D. S. Waddy & Company, first became connected with Fenner & Beane on March 1, 1932, who operated a brokerage business until June, 1933, when the business was taken over by Fenner, Beane & Ungerleider, which partnership continued until June, 1934, when the business was taken over again by Fenner & Beane, a partnership, which continued until August 18, 1941, when the partnership of defendants was formed.

3. In 1932, David S. Waddy, a citizen of Fort Smith, Arkansas, became a correspondent of Fenner & Beane and was so designated, but such designation was later changed to wire connection. As a practical matter there is no difference between a correspondent and a wire connection, and hereinafter Waddy will be referred to as a correspondent. In general, a correspondent is a dealer in stocks, bonds, securities and commodities and, because of not being a member of the stock and commodity exchanges, must have his orders executed through a broker who is a member and who, in such transactions, is referred to as the carrying broker. Subject to the rules of the exchange, the member broker is permitted to supply certain facilities to the correspondent, and in the instant case, correspondent Waddy was furnished a teletype wire connection and a cotton ticker. Also, he was supplied six chairs by Fenner & Beane as well as certain office forms necessary for the conduct of his business as a correspondent and a rubber stamp with name of defendants thereon. Waddy paid all expenses incurred in the operation of his office (exclusive of those facilities and services furnished by Fenner & Beane and successors, including defendants) including

office rent, employees salaries, supplies, etc.

In order to qualify as a correspondent, or to associate himself with a member broker, it was necessary that Waddy comply with rules of the particular exchange where orders of his customers were to be executed. He executed a private wire contract with the New York Stock Exchange (defendants' exhibit No. 1 as to Fenner & Beane) pertaining to the receipt and use by the correspondent of quotations received through the member broker. In regard to the furnishing of facilities by the member broker to the correspondent, Rule 460 of the New York Stock Exchange (defendant's exhibit No. 8) provides:

"No member or member firm shall establish or maintain any wire connection or permit communication by any private radio system between his or its office and the office of any non-member without the prior consent of the Exchange. The use of public telephone or telegraph service in such manner as to amount to private connection shall be deemed to be a wire connection within the meaning of this Rule. Every such means of communication shall be registered with the Exchange. Notice of the discontinuance of any such means of communication shall be promptly given. The Exchange may require at any time that any such means of communication forthwith be discontinued."

Rule 479 (defendant's exhibit No. 10) provides:

"No member or member firm shall directly or indirectly pay any expense pertaining to the office of a non-member, except that the cost of a means of communication between the office of a member or member firm and a non-member may be paid by the member or member firm."

4. The practice of Fenner & Beane in clearing transactions on the various Exchanges for the customers of correspondents is outlined fully in plaintiffs' exhibit No. 17.

"The purpose of this notice is to outline the plan which is followed by us in clearing transactions on the various Exchanges for the customers of our wire correspondents when the names of such customers are disclosed to us.

"Our wire correspondents transmit to us orders placed with them by their disclosed customers, whereupon we open an individual account for each customer and in addition to confirming all executions in those accounts to our wire correspondents, we send mail confirmations direct to the customers. At the end of each month, we issue a monthly statement of his account to each customer, sending a carbon copy to the wire correspondent.

"While we are authorized to make purchases and sales for the customer's account, in accordance with instructions received from his agent, the correspondent, we do not make deliveries of securities, or payments of funds except direct to the customer, unless he should instruct us from time to time to do otherwise.

"It is to be observed, therefore, that in addition to the responsibility of the wire correspondent, which is usually considerable, the customer has the full responsibility of our firm on every order which we receive and confirm to him and on funds or securities for which we issue receipts."

This practice remained effective through the various changes of the Fenner & Beane partnership, and was and is the practice followed by the defendants.

5. The account symbol assigned to correspondent Waddy was "BQ". Where the names of the customers were disclosed to the defendants, a segregated account was set up on the books of the defendants, and each customer was given a separate account number, such as, BQ 2 or BQ 10, etc. When a customer went to the office of D. S. Waddy and placed an order for the purchase of securities, Waddy gave him a confirmation stating "In accordance with your instructions we have this day bought for your account and risk: (Account number)" and containing the following information: quantity of securities; name of security; price on New York Stock Exchange; name of New York Stock Exchange Firm (at times the name of defendants' firm was stamped in but usually it was left blank); Commission charged by

New York Stock Exchange Brokers; Our commission; Taxes; Shipping expense; and Totals. Correspondent Waddy then wired the order to defendants at New Orleans, and defendants executed it upon the floor of the New York Stock Exchange. If the order was placed with defendants upon a disclosed basis, a segregated account was opened in name of customer and a confirmation of the execution was then sent to the customer, with a copy going to correspondent Waddy, and the securities were held by defendants in their "street name", or in the name of the former owner, awaiting deposit of money covering the transaction. Defendants maintained bank accounts in the Merchants National Bank and First National Bank of Fort Smith, Arkansas, and made arrangements with these banks for them to notify defendants by code wire of any and all deposits made to their accounts. After receipt of the confirmation of execution the customer paid correspondent Waddy the money which was then deposited in defendants' bank account at one of the local banks. The bank would wire defendants, and then the latter would transfer the securities to the customers account, where they would remain until and unless ordered out by the customer. Although defendants requested that payment be made within three days, securities would be held a maximum of seven days, without payment. After the expiration of that period, however, the securities would be sold for the account of the customer. Defendants did not correspond with customers having segregated accounts through the office of Waddy, but required the latter to furnish them the mailing address of the customers (see letter on subject identified as plaintiff exhibit No. 7).

From his original association with Fenner & Beane until the closing of his office in January, 1949, correspondent Waddy maintained, on the books of the member broker, and from August 18, 1941, on the books of the defendants, an account in his own name. Originally this account was identified as BQ 1, which was a true omnibus account, in that trading was done through the account for undisclosed customers on a margin basis or by the extension of credit. This account continued from 1932 until May 19, 1939, at which time it was closed at the request of Fenner & Beane. The request was in the form of a letter from C. E. Fenner addressed to D. S. Waddy under date of May 15, 1939. That letter reads as follows, omitting the formal parts thereof:

"As I have had no reply to my letter of the 5th, I am afraid that you do not appreciate how important the matter is. The Exchanges insist on our having a certified financial statement from any wire connection carrying an Omnibus Account with us. Of course, the alternative is to dissolve the Omnibus Account and carry the customer's names segregated. Have you any objection to doing this? In other words, what is your purpose in using the Omnibus Account method for a portion of your transactions?

"I beg that you let me have a prompt reply as the matter is not one over which we have control."

There was also an Account BQ 14 in Waddy's name, which account was a special cash omnibus account, in that trading through the account was for customers on an undisclosed basis but involved only cash transactions and, after closing BQ 1, all transactions were carried in BQ 14 until the installation of International Business Machines in the bookkeeping department of defendants at which time all accounts were given new numbers, and on April 23, 1940, the account in Waddy's name was changed from BQ 14 to BQ 10-012, there being no change in the nature of the account, and it remained a special cash omnibus account until the closing of his office in January, 1949. It should be noted at this point that defendants directed correspondent Waddy to close BQ 10-012 by letter of August 13, 1948. That letter (plaintiffs' exhibit No. 37), written by Darwin S. Fenner, a general partner of defendants' partnership, addressed to D. S. Waddy, reads as follows, omitting the formal parts:

"For quite some time you have been making cash purchases in your omnibus account BQ 10-012.

"Our understanding with all of our wire connections is that all accounts will be segregated. We known from experience that this is best for our mutual protection for we can then see that all legal requirements are complied with, and that the danger of future liability is minimized.

"In the future, unless you are buying stock for yourself, will you please open separate accounts for your customers." As will appear later, this letter, directing the closing of BQ 10-012, precipitated the closing of Waddy's office, which occurred in January, 1949.

Transactions through account BQ 10-012 (and its predecessor accounts BQ 1 and BQ 14) were conducted as follows. When a customer placed an order with correspondent Waddy, he issued the identical confirmation that he issued where the transaction was in a segregated account, except the confirmation showed the transaction to be in BQ 10-012. In such transactions, all subsequent contacts or correspondence were between the member broker (the last one being the defendants) and the correspondent. Confirmation of the execution of the order was sent to Waddy, and after the deposit of the money in the bank and receipt of notice thereof by defendants, the securities were entered in the BQ 10-012 account, where they remained unless and until ordered out in the name of the customer by Waddy, or ordered sold by him. Therefore, the first and only time that the defendants acquired knowledge of the name of the actual purchaser was in the event the securities were ordered out in the individual purchaser's name. In other words, the BQ 10-012 account was treated on the records of the defendants as to Waddy the same as any other customer's account.

6. The member broker associated with Waddy at any particular time required of him compliance with the rules and regulations of the S. E. C. and of the various exchanges, particularly the New York Stock Exchange. In fact, apparently most if not all "inter-office" communications calling attention to the various rules and regulations and changes therein and the general business of the member broker were sent to branch offices and correspondents without discrimination. For example the following communications were received by Waddy:

(1) Communication under date of June 3, 1936, (Plaintiffs' No. 8) requesting assistance in obtaining cooperation of customers in regard to audit of accounts.

(2) Communication under date December 11, 1936, (Plaintiffs' No. 9) concerning reworking accounts and cancellation of certain accounts in order to relieve congestion interfering with Addressograph Department of member broker.

(3) Letter of March 13, 1940, (Plaintiffs' No. 11) addressed to D. S. Waddy advising that Mr. Darwin S. Fenner had sent a general memorandum to all branch offices concerning questions and answers to questions regarding service charges recently adopted by the New York Stock Exchange and enclosing copy of memorandum in the letter.

(4) Communication under date of December 17, 1940, (Plaintiffs' No. 13) dealing with educational bulletin issued by New York Stock Exchange and concerning interest to be charged on cash transactions where payment is received from the customer after settlement date, etc.

(5) Communication under date February 28, 1941, (Plaintiffs' No. 14) concerning changes in the Industries Service by addition of a "Share Appraisal" section.

(6) Communication under date April 4, 1941, (Plaintiffs' No. 15) advising that new forms covering transfer from Regulated Commodity Accounts to Securities Accounts or Unregulated Commodity Accounts of excess funds to avoid calling of margins would be supplied and that old forms were to be destroyed.

(7) Communication dated April 9, 1941, (Plaintiffs' No. 16) advising of additional change in Industries Service by adding "General Business and General Comment" section.

(8) Communication dated April 2, 1941, (Plaintiffs' No. 19) giving report of business and requesting renewed selling activity, particularly in the commodity field and after-hours offerings.

(9) Communication dated December 22, 1948, (Plaintiffs' No. 32) concerning new postage rates.

(10) Communication dated September 24, 1948, (Plaintiffs' No. 33) enclosing Internal Revenue Bulletin #17 concerning speculative commodity accounts.

(11) Communication addressed to D. S. Waddy under date of April 10, 1948, (Plaintiffs' No. 34) enclosing Security Margin Requirements.

(12) Communication addressed to all FB Wire Connections under date of October 7, 1940, (Plaintiffs' No. 39) advising that it was necessary that wire connections file monthly Form No. 150 C.E.A. with the Commodity Exchange Administration and enclosing the prepared form to be forwarded to the C.E.A.

7. Apparently it was the practice of the member broker to have all business in the area served by Waddy's office routed through his office. For example, letter written by Fenner & Beane addressed to Mr. E. E. Young, Cave Springs, Arkansas, under date of July 12, 1937, (Plaintiffs' No. 38), reads as follows, excluding the formal parts thereof:

"It is our wish, at all times, to bring to your brokerage account a complete and efficient service. We feel that this can best be done through the branch nearest your residence. May we suggest, therefore, that you allow us to transfer your account, until recently handled by our Tulsa office, to our branch in Fort Smith.

"We want to do this, however, only if it meets with your wishes. If you will make an O.K. on this letter and return it in the envelope enclosed, all necessary arrangements will be made."

Furthermore the same service was accorded Waddy's customers as customers of branch offices on requests for information concerning the current market status and outlook for any particular concern and its securities and the requests were answered by the research department of the member broker, such answers going either to Waddy or to the particular customer according to the request. (Plaintiffs' Nos. 12, 18 and 40).

8. On frequent occasions Waddy contacted the member broker with which he was associated at the time for advice in the conduct of his business, particularly from the standpoint of his status under the regulations of the Securities and Exchange Commission.

In this connection Waddy sought the advice of Fenner & Beane on the necessity of his registering as a dealer doing business in "over-the-counter markets", and by letter under date of December 20, 1935, (Plaintiffs' No. 6) written by Bronson Goddard of Fenner & Beane, he was advised, inter alia, as follows:

"Mr. John McCorkle has forwarded me your file relating to your registration on Form 1M of the Securities and Exchange Commission.

"Inasmuch as all of your purchases and sales are made through us it is my opinion that you are not required to register as a dealer doing business in over-the-counter markets. However, as I see it the question really boils down to a practical one inasmuch as there is no filing fee for Form 1M and since the form itself is relatively simple. I can see no harm in your registering as such a dealer and, therefore, recommend that you do so. If you do not it may be that you will have further trouble with the authorities in Washington."

Waddy was given advice in 1942, 1943, and 1945 concerning the necessity of his filing a certified financial statement under Rule X-17A-5 of the Securities and Exchange Commission, which will be more specifically dealt with in the next finding (No. 9).

9. Rule X-17A-5 of the Securities and Exchange Commission provides, in part, as follows:

"(a) Reports to be made annually.—Every member of a national securities exchange who transacts a business in securities directly with others than members of a national securities exchange, and every broker or dealer who transacts a business in securities through the medium of any such member, and every broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934,

as amended, shall file on form X-17A-5, during each calendar year commencing January 1, 1943, a report of his financial condition as of a date not more than 45 days prior to the filing thereof: * * *.

"(b) Nature and form of reports.—Each report of financial condition filed pursuant to paragraph (a) hereof shall be prepared and filed in accordance with the following requirements:

(1) The report of a member, broker, or dealer shall be certified by a certified public accountant or a public accountant who shall be in fact independent (A) if said member, broker, or dealer is required to file a certified financial statement with any agency of any state in which he does business as a condition of doing business in securities therein, or is required to file a certified financial statement with any national securities exchange of which he is a member, or (B) if, during the year preceding the date as of which his financial condition is reported said member, broker, or dealer has made a practice of (i) extending credit in any form to customers (such as carrying margin accounts or selling securities on a partial payment or installment basis): * * *; (ii) *holding securities owned by customers, except as an incident to transactions with or for customers which are promptly consummated by delivery*, or (iii) carrying credit balances of customers, except as an incident to transactions with or for customers which are promptly consummated by payment;" (Emphasis supplied.)

In the latter part of 1942 the S. E. C. forwarded to D. S. Waddy a form to be executed by the latter in accordance with the provisions of Rule X-17A-5, set forth above. Waddy wired R. L. Dore of the defendants' firm requesting advice as to his response to the request of the S. E. C. By letter under date of December 17, 1942, (Plaintiffs' No. 24) Mr. C. E. Fenner wrote Waddy as follows, excluding the formal parts of the letter:

"This is written in connection with the Form which you received from the SEC and about which you wired Ruble Dore.

"The SEC has no office in New Orleans but I communicated with the CEA and asked their advice. They have replied that the form in question, X-117A-5, in their opinion applies only to interior brokers who carry an Omnibus Account, or to clearing brokers. I suggest, therefore, that you write the SEC, state that you have received the form referred to and that all of the business of your customers is carried by MLPF & B, who deal (deal) *direct* with your customers, mail all documents, such as Purchase & Sale slips, etc., to your customers and that, in fact, you are, therefore, merely a transmitting broker. Make it clear, in other words, that you are not handling an *Omnibus* Account, but are handling *segregated* accounts.

"If you will do this and send me copy of your letter, I think you will find that the matter is taken care of satisfactorily."

By letter dated January 4, 1943, (Plaintiffs' No. 25) Waddy wrote the Securities and Exchange Commission in accordance with the suggestion of Mr. Fenner in his letter to Waddy of December 17, 1942.

Apparently the S.E.C. made further inquiry by letter of January 9, 1943, since the record reveals the following letter from C. E. Fenner to D. S. Waddy under date of January 14, 1943, (Plaintiffs' No. 26) with the formal parts excluded:

"I think that the reply that you should now make to the Securities & Exchange Commission should be approximately as follows:—

"'In accordance with your letter of January 9th, I am enclosing herewith the report of my financial condition prepared as of December 1, 1942, which report I submitted to the C. E. A., as my business is chiefly commodities.

"'In such a business as mine, capital is not necessary for the reason that I carry segregrated accounts and the responsibility of Merrill, Lynch, Pierce, Fenner & Beane stands behind all of my transactions made for my customers.

"'I trust that you will not require me to submit a report from a Certified Public Accountant, which would entail quite an expense on my part.'

"If I were you, I would address the reply to 'Mr. James A. Treanor, Jr., Di-

rector, Attention—Mr. Orrin C. Knudsen, Counsel', who signed the letter.

"I am returning herewith your entire file."

The letter written in accordance with this suggestion was accepted by the S. E. C., as is evidenced by letter dated March 11, 1943, (Plaintiffs' No. 27) written by O. H. Allred, Regional Administrator, Securities and Exchange Commission, addressed to D. S. Waddy, and the latter was not required to file a financial statement certified by a C. P. A.

By letter dated May 9, 1945, (Plaintiffs' No. 28) written by R. L. Dore of the defendants' firm addressed to D. S. Waddy, the latter received the following advice in regard to certain questions propounded by the S. E. C. in connection with amendments to Form 2-17, which relates to over-the-counter brokers and dealers (the formal parts of letter are omitted) :

"Replying to your letter of the 29th, I think that all that is necessary is for you to write Mr. James A. Trianor, Jr., Director, a letter substantially as follows :—

" 'Dear Mr. Trianor:

" 'I am in receipt of your circular letter of April 9th, concerning certain amendments to Form 3-17, which relates to Over-the-Counter brokers and dealers.

" 'I will find it very difficult, if not impossible, to reply to the various questions as I am not an over-the-counter broker.

" 'I am a wire connection, or correspondent, of the New York Stock Exchange firm of Merrill Lynch, Pierce, Fenner & Beane. They carry all of my customers on a disclosed basis—that is to say, I reveal the name of the customers of Merrill Lynch, Pierce, Fenner & Beane, who confirm all purchases and sales direct to them. My customers pay me voluntarily an over-ride, or extra commission for the services which I offer and for maintaining an office here.

" 'I also have one account where the customers names are not disclosed, but this is strictly a cash account and is very small, carried for convenience.

" 'I am, as you may know, an Associate Member of the New Orleans Cotton Exchange, and derive a commission on commodity transactions, which is allowed under the rules of the Cotton Exchange.

" 'Under these circumstances, as you will note, my responsibility is of no consequence. The firm of Merrill Lynch, Pierce, Fenner & Beane is responsible to and confirm all transactions made direct to my customers, who look to that firm only for the responsibility.

" 'Therefore, I do not think that you will wish me to file the application referred to, but be assured that I always wish to comply with the rules and regulations of the Securities Exchange Commission.'

"This letter being a friendly letter may have the proper effect."

By letter dated May 26, 1945, (Plaintiffs' No. 29) Waddy wrote Mr. Treanor as suggested by Mr. Dore in his letter to Waddy of May 9, 1945. Apparently, however, it was insisted that Waddy file the form, for Waddy wrote Mr. Treanor by letter dated July 6, 1945, (Plaintiffs' No. 30) as follows, excluding formal parts:

"I wish to thank you for your very nice letter of explanation, dated 6/16/45, and enclosed herewith, please find form 6-M filled in to the best of my ability, and in accordance with your letter.

"Since the filing of my original Form 1-M 12-7-35, there has been no change whatever in the status of my business here. I have never handled any securities for profit—all my transactions have been through my correspondent firm of Fenner & Beane until 8/16/41, at which time the merger resulting in the present firm of Merrill Lynch, Pierce, Fenner & Beane was formed.

"I trust the attached form is in accordance with your wishes—if there should be any discrepancy, I would indeed appreciate your notifying me."

Apparently the form was executed in accordance with the suggestion of Mr. Dore in his letter of May 9, 1945, that "I also have one account where the customers names are not disclosed, but this is strictly

a cash account and is very small, carried for convenience."

10. An analysis of the BQ 10-012 account for the last six months of 1942, all of 1943, all of 1944, and for the first six months of 1945 (the period covered by the advice given by defendants as set forth in finding No. 9) reveals the following:

(1) The debit entries in the account for that period total $1,533,023.31.

(2) The credit entries in the account for that period total $1,538,528.24.

(3) For the period there was an average of $42,633.97 debit entries per month and an average of $42,736.89 credit entries per month.

(4) During the month of December, 1942, the month in which Mr. C. E. Fenner wrote D. S. Waddy under date of December 14, 1942, concerning Waddy's reply to the form from S. E. C. regarding financial reports, debit entries amounted to $82,640.87 and credit entries amounted to $79,885.61.

(5) During the month of January, 1943, the month in which Mr. C. E. Fenner wrote D. S. Waddy under date of January 9, 1943, concerning the same matter, the debit entries amounted to $36,414.04 and credit entries amounted to $32,437.33.

(6) During the month of May, 1945, the month in which Mr. R. L. Dore of defendants' partnership wrote D. S. Waddy under date of May 9, 1945, concerning questions in regard to amendments to form 2-17 relating to over-the-counter brokers, and in which he advised Waddy to tell the S. E. C. that BQ 10-012 was a small cash account carried for convenience, debit entries amounted to $81,859.43 and credit entries amounted to $77,397.28.

11. Throughout the existence of the BQ 10-012 account, and its predecessor accounts, there were on hand at all times substantial amounts of securities purchased through that account by Waddy for his customers. An examination of the BQ 10-012 account (Plaintiffs' No. 92) discloses that some of the securities were carried "long" for a considerable period of time, including securities ordered and purchased for two of the plaintiffs. For example, plaintiff, J. K. Fraser, ordered 200 shares of Murray Corporation stock on February 10, 1947, which order was executed by defendants and the stock entered in the BQ 10-012 account. This stock was held in that account until October 7, 1948, when it was ordered sold by Waddy. The same was true of the stock ordered by plaintiff, R. P. Hawkins, which orders were executed by the defendants and the stock held in BQ 10-012 until ordered sold by Waddy.

The securities in BQ 10-012 were not held "as an incident to transactions with or for customers which are promptly consummated by delivery".

12. Defendants had knowledge of the fact that Waddy was trading for other persons in the BQ 10-012 account. As set out in finding No. 10 the monthly average of debit entries for the period 1942 to 1945 was $42,633.97. It would have taken a considerable amount of capital for one to trade on his own in such a volume. Defendants knew that Waddy's financial condition was such as to prohibit such trading. In this regard defendants had intervened in Waddy's behalf when the latter was attempting to secure a membership on the New Orleans Cotton Exchange, but the application was denied because Waddy was unable to satisfactorily show that he had capital amounting to $5,000.00. In fact, his financial statement for the year 1947 (it may be safely assumed that this statement is fairly representative of his net income for the previous few years) shows a net profit of $6,706.38, and nothing appears thereon to indicate that he had been doing any trading in securities in his own behalf. Also, in letter dated May 9, 1945, written by R. L. Dore of the firm of defendants and addressed to D. S. Waddy (in which the suggested letter to be sent by Waddy to the Securities Exchange Commission was set out, finding No. 9) the following appears: "I also have one account where the customers names are not disclosed, but this is strictly a cash account and is very small, carried for convenience". Also, Mr. Darwin S. Fenner wrote D. S. Waddy

under date of August 13, 1948, stating, "For quite some time you have been making cash purchases in your omnibus account BQ 10-012. Our understanding with all of our wire connections is that all accounts will be segregated." (Letter appears in finding No. 5). Yet, the defendants did not close the account BQ 10-012 on that date but permitted Waddy to continue for sometime thereafter. The last purchase for that account was September 2, 1948, although defendants made deliveries out of the account as late as October 20, 1948. (See, Plaintiffs' Exhibit No. 92). Furthermore, at times securities held in BQ 10-012 were ordered out by Waddy in the individual purchaser's name, thus advising defendants that Waddy was trading for others.

Defendants were aware of the method employed by Waddy in transacting business through BQ 10-012. The identical procedure was followed after the formation of the partnership of defendants as was followed by Waddy while he was a correspondent of Fenner & Beane, and, as is evidenced by the following correspondence, that procedure was brought specifically to the attention of Fenner & Beane. By letter under date of April 29, 1941, Mr. English of Fenner & Beane wrote Mr. Waddy as follows (Plaintiffs' No. 20), excluding the formal parts:

"An auditor of the New York Stock Exchange, by whom we are presently being checked up, has made certain inquiries regarding the Special Omnibus Cash Account #10012 which we carry for you, and after I explained its purpose to him, he asked whether I knew whether on the confirmations to your customers you show the commission which we have charged you, in addition to the commission which you charged your customers. In this connection, he invited my attention to Section 7 (e) and (f) of the private wire contract which you were required to enter into with the New York Stock Exchange before the Exchange granted its approval of our extension of wire service to you.

"I have told the Exchange auditor that we do not know what procedure you follow in commissions as to your confirmations to your customers on transactions which are handled in your Special Omnibus Cash Account, and he has suggested that it might be a good idea if we brought the matter to your attention. I shall appreciate it therefore if you will let me know whether your procedure conforms to the requirements."

By letter under date of May 1, 1941, Waddy replied as follows (Plaintiffs' No. 21), excluding the formal parts:

"Acknowledging receipt of your letter of the 29th. ult. please find attached one of our forms which is filled in on each and every security transaction. The original of this form, I hand to the customer, whether the transaction is handled through the Special Omnibus Cash Account, or whether the transaction is through the customer's regular account carried under his own name and code.

"You will note that the form specifically states both your commission and our commission charges. This form was approved by the Stock Exchange when I first became associated with Fenner & Beane in 1932 and there have been no changes made in it."

Then, by letter under date of May 6, 1941, Mr. English wrote Waddy as follows (Plaintiffs' No. 22), excluding the formal parts:

"Thank you very much for your letter of May 1 regarding your procedure in revealing to customers the commission which we have charged.

"I have reviewed your procedure and examined the confirmation form which you sent me and am happy to be able to tell you that your procedure is entirely correct."

At the times of the purchases by the plaintiffs they were not advised that the stock was to be purchased and held in Waddy's account. The confirmations received by them listed the account as BQ 10-012 (or its predecessor account BQ 14) but the significance of that symbol was not explained to plaintiffs.

In the course of his business Waddy acted both as a broker and a dealer, and

with reference to the transactions between him and the plaintiffs, he did not disclose to any of them, in writing or orally, whether he was acting as a dealer for his own account or as a broker for them, but did advise each of them that all he received was the commission shown on the written confirmation.

13. The sign over the entrance to D. S. Waddy's office was as follows:

"Stocks-Bonds D. S. Waddy & Company Commodities

Wire Connection Merrill-Lynch-Pierce-Fenner & Beane.

Members New York Stock Exchange and Other Leading Exchanges."

"D. S. Waddy & Company" appeared on the sign in the largest type; "Stocks-Bonds", "Commodities" and "Merrill-Lynch-Pierce-Fenner & Beane" appeared in type of approximately the same size but somewhat smaller and less prominent than "D. S. Waddy & Company"; "wire connection" appeared in the smallest type. The sign as herein set forth had been in place for only a few months, but was the same as the prior one, with the exception that "correspondent" appeared on the old sign where "wire connection" appeared on this one.

Defendants furnished Waddy various literature, stock records, and data of interest to investors and prospective investors. These publications were in Waddy's office and were available to anyone coming into the office. The following publications were introduced as having been obtained from Waddy's office, and upon each appears the name of Merrill Lynch, Pierce, Fenner & Beane in some capacity, either as having prepared the same or as supplying it though it was prepared by another concern:

(1) Investor's Tax Guide, 1948, showing on the cover that the publication was prepared by Prentice-Hall for the defendants. On the back cover page of the publication appears a list of the offices of the defendants. Offices are listed as being at Hot Springs, Little Rock, and Pine Bluff, Arkansas. Fort Smith is not listed.

(2) Petroleum, Investigate then Invest. The same list of offices appears on the back cover page.

(3) Security and Industry Survey, November, 1948. The same list of offices appears on the back cover page.

(4) Stock Record, October 1, 1948.

(5) Monthly Stock Digest, October, 1948.

(6) Wheat, September 1948.

These publications may be obtained by anyone either by writing for them or by picking them up at a branch office or the office of a correspondent. In fact, defendants advertise that they have them for free distribution to anyone so requesting.

At intervals Waddy posted the market news sent by defendants over their wire on note paper bearing the heading of Merrill Lynch, Pierce, Fenner & Beane.

14. In early January, 1949, correspondent Waddy notified Mr. Darwin S. Fenner, general partner of the firm of defendants, that he was in "trouble" with his accounts and requested that Mr. Fenner come to Fort Smith. On January 7, 1949, Mr. Fenner arrived in Fort Smith and a cursory examination of Waddy's records revealed an approximate shortage of $35,000.00.

Since the market was open for only two hours on Saturday, January 8, 1949, Mr. Fenner advised Waddy to remain open for that day but insisted that Waddy receive no orders for securities. Saturday, January 8, 1949, was the last day that Waddy operated his office, and he thereafter removed his books and records to his home. He posted the following sign on the door of his office:

"To Whom It May Concern.

"As of Saturday January 8th. 1949, I have terminated my brokerage business in Stocks, Bonds and Commodities operated as D. S. Waddy & Company

"D. S. Waddy"

Defendants, through Mr. Darwin S. Fenner, arranged to keep the office, 623 Garrison, open for a few days, and during this period paid the rent. In this connection the following notice was posted:

"As a convenience to those who require brokerage facilities in stocks, bonds, and

commodities and the undersigned have arranged to have a representative at 623 Garrison Avenue for a few days."

"Merrill Lynch, Pierce, Fenner & Beane"

Then, on Friday, January 14, 1949, the following notice was posted:

"This office will not be reopened by us. Our representative, Mr. Anderson will be at the Ward Hotel for consultation until Jan 21. We will welcome your calls there. We appreciate your cooperation and patronage during the past week, and hope that you will avail yourself of the opportuntiy of calling our Tulsa office. Ask operator for Enterprise 500.

"Merrill Lynch, Pierce, Fenner & Beane."

In accordance with the above a representative of the defendants did maintain a room at the Ward Hotel for a few days.

15. On the last day of the trial the parties executed and filed a stipulation in which they agreed as to what occurred in the transactions of each of the plaintiffs.

As to the plaintiff, R. P. Hawkins, the parties stipulated that the stock described in the complaint was in fact ordered by said plaintiff from Waddy and that the said plaintiff, Hawkins, paid Waddy the purchase price for said stock but that Waddy did not execute the various orders through the defendants and that the defendants had no actual knowledge of the transactions between the plaintiff, R. P. Hawkins, and Waddy and that the sums collected by Waddy from said plaintiff were never transmitted to the defendants. This stipulation does not reflect fully the transactions that were had by this plaintiff with Waddy or by Waddy with the defendants and the Court understands that the parties are considering filing an amendment thereto, but the facts can be determined from the records that are in evidence without waiting for the stipulation to be amended.

An examination of the account and a comparison of the written confirmations executed by Waddy and delivered to the plaintiff, Hawkins, being plaintiffs' exhibits 52, 53, 54, 55, 56, 57, 58 and 59 reveal the following:

Plaintiffs' exhibit 52 shows on February 28, 1938, the purchase of 100 shares of United Gas Corporation at $4.00 per share or $400.00, plus $5.00 commission to Fenner & Beane and $5.00 commission to Waddy, and the omnibus account being carried at that time shows that the stock was purchased on March 2, 1938.

Exhibit 53 shows a purchase by Hawkins on April 8, 1938, of 100 shares of United Gas Corporation at $1⅞ per share or $187.50, plus $5.00 commission to Fenner & Beane and $5.00 commission to Waddy, and the account kept by Fenner & Beane shows a purchase of the stock by them on April 11, 1939 (evidently the confirmation should have been dated 4-8-39 or Waddy waited for one year and three days in which to buy the stock.)

Exhibit 54 shows that on April 11, 1939, the said plaintiff purchased 100 shares of United Gas Corporation at $1⅝ per share or $162.50, plus $5.00 commission to Fenner & Beane and $5.00 commission to Waddy, and an examination of the account shows a purchase on April 13, 1939, of 100 shares of United Gas Corporation.

The three purchases above set forth were made in account BQ 14.

Plaintiffs' exhibit 55 shows that on November 16, 1943, the plaintiff, Hawkins, purchased 200 shares of United Gas Corporation at $2.00 per share or $400.00, plus $14.00 commission to defendants and $10.00 commission to Waddy, and an examination of BQ 10-012 shows a purchase of 200 shares of United Gas Corporation on November 18, 1943, by defendants.

Plaintiffs' exhibit 56 shows that he purchased from Waddy on November 17, 1943, 800 shares of United Gas Corporation at $2.00 per share or $1600.00 plus $56.00 commission for defendants and $40.00 commission to Waddy, and an examination of BQ 10-012 shows a purchase on November 19, 1943, of 800 shares of United Gas Corporation by defendants.

Plaintiffs' exhibit 57 shows that on January 4, 1946, the plaintiff, Hawkins, purchased 400 shares of United Corporation at $3⅝ per share or $1450.00 plus $32.00 commission for the defendants and $20.00 com-

mission for Waddy and BQ 10-012 shows on January 8, 1947, a purchase of 400 shares of United Corporation by defendants (It will be noted that the confirmation given by Waddy to Hawkins is dated 1-4-46 while the account shows the stock was purchased 1-8-47. Evidently the confirmation should read 1-4-47 instead of 1-4-46.)

Plaintiffs' exhibit 58 shows that plaintiff, Hawkins, purchased on February 7, 1946, 84 shares of United Gas Corporation at $17$\frac{1}{8}$ per share or $1438.50, plus $14.10 commission to defendants and $4.20 commission to Waddy and 45 cents for taxes, and BQ 10-012 shows a purchase of 84 shares of United Gas Corporation on February 13, 1946, by defendants.

Plaintiffs' exhibit 59 shows a purchase by plaintiff, Hawkins, on January 3, 1947, of 100 shares of United Corporation at $3$\frac{5}{8}$ per share or $362.50 plus $8.00 commission for defendants and $5.00 commission for Waddy, and an examination of BQ 10-012 shows a purchase of 100 shares of United Corporation on January 8, 1947.

In other words, the plaintiff, Hawkins, actually purchased from February 28, 1938, to January 8, 1947, the said shares of stock and the defendants received from Waddy $6,140.10 to cover purchase price and their commission, and in addition to that sum Waddy received $94.65, so that plaintiff Hawkins actually expended $6,234.75 as shown by the accounts BQ 14 and BQ 10-012.

After the stipulation hereinbefore referred to had been signed by the parties there was further orally stipulated in open court that an examination of BQ 10-012 shows that there is still in the said account 500 shares of United Corporation which the parties were of the opinion belongs to the plaintiff, Hawkins, and which the defendants tendered into court for Hawkins, subject, however, to any claim that Waddy might have against said 500 shares of United Corporation stock.

The remaining stock purchased as shown above was ordered sold from time to time by D. S. Waddy and he received credit therefor. He never accounted to the plaintiff, Hawkins, for any of the stock or money.

16. The plaintiff, Rose Goodman, purchased from Waddy on December 14, 1948, 12 shares of American Telegraph & Telephone Company at $150.00 per share or $1800.00, and paid Waddy the said $1800.00 plus $6.00 commission for defendants and $2.00 commission for himself, taxes 72 cents and shipping expense 30 cents, making a total of $1809.02, but Waddy never transmitted that order to the defendants and the defendants never executed the order nor is there any testimony to show that they received any of the amount so paid by the plaintiff, Rose Goodman. Waddy has never accounted to the plaintiff, Goodman, for any of said stock or money.

This plaintiff, on July 17, 1936, purchased some stock through Waddy and paid him $1480.00 therefor. Evidently Waddy executed that order through a segregated account as she testified that she received the stock on that purchase from the predecessor (Fenner & Beane) of the defendants.

17. The plaintiff, J. K. Fraser, as shown by plaintiffs' exhibit 77, purchased through Waddy on February 10, 1947, 200 shares of Murray Corporation stock at $14$\frac{5}{8}$ per share or $2925.00, plus $32.32 commission to the defendants and $10.00 commission to Waddy and 30 cents shipping expense, making a total of $2967.62 paid to Waddy on that purchase. The stock was purchased through BQ 10-012 by the defendants, and that account shows that 200 shares of Murray Corporation stock was purchased by defendants on February 14, 1947.

A deposit ticket introduced in evidence as Plaintiffs' exhibit 67 shows that Waddy deposited in the Merchants National Bank of Fort Smith on February 11, 1947, to the account of the defendants the sum of $2957.32, which is the exact amount of this purchase made by the plaintiff, Fraser, or the sum of $2925.00 for the stock and $32.32 commission.

On October 13, 1948, the defendants sold this 200 shares of Murray Corporation stock which was being carried in BQ 10-012 and credited the proceeds of the sale to Waddy, but Waddy never accounted to the plaintiff, Fraser, for any part thereof.

On February 19, 1947, as shown by plaintiffs' exhibit 79 the plaintiff, Fraser, pur-

chased 200 shares of Crown Drug Company stock at $6.00 per share or $1200.00, plus $22.00 commission for defendants and $10.00 commission for Waddy, and on February 24, 1947, Waddy deposited to the account of defendants in the Merchants National Bank of Fort Smith $1222.00, being the exact amount of the purchase price of the Crown Drug Company stock, or $1200.00 plus $22.00 commission for the defendants.

This order was executed on February 24, 1947, and this particular stock is still in the possession of the defendants standing in the said account BQ 10-012. At the conclusion of the trial the defendants announced that they tendered said 200 shares of Crown Drug Company stock to the plaintiff, Fraser, subject to any claim that Waddy might have thereon.

Defendants actually received from the plaintiff, Fraser, a grand total of $4,179.32 and he paid Waddy in addition thereto the sum of $20.30 making a total of $4,199.62 expended by plaintiff, Fraser.

18. The plaintiff, Raymond Allen, on November 4, 1948, bought through Waddy 100 shares of North American Aviation stock at $9⅞ per share or $987.50 and paid said sum plus $14.88 commission for the defendants and $5.00 commission for Waddy, making a total of $1007.38.

On November 18, 1948, the same plaintiff purchased 100 shares of Continental Motors stock at $7⅝ per share or $762.50 and paid therefor said sum plus $12.63 commission for defendants and $5.00 commission for Waddy making a grand total of $1787.51, which the plaintiff, Allen, paid to Waddy.

The confirmations issued by Waddy for those purchases show the stocks to have been purchased through BQ 10-012, but an examination of the account does not reveal that the defendants executed either of those orders or that defendants received the money therefor. Waddy has not accounted to the plaintiff, Allen, for the money or stock.

19. On October 20, 1941, the plaintiff, C. R. Sadler, purchased through Waddy 100 shares of Curtiss Wright stock at $8¾ per share or $875.00 and paid therefor said sum plus $12.00 commission to the defendants and $5.00 commission to Waddy, making a total of $892.00.

The stipulation of the parties says that Waddy did not execute this order through the defendants but BQ 10-012 reflects that on October 24, 1941, the defendants purchased for Waddy 100 shares of Curtiss Wright at $8½ per share and on the same date credited Waddy with $33.00, and the inference is that the order was executed by the defendants because subsequent thereto Waddy paid the plaintiff dividends on the stock as they were issued by Curtiss Wright, but as the account BQ 10-012 stands now the stock does not appear thereon and evidently it was sold by Waddy and Waddy did not account to plaintiff.

20. On September 14, 1948, the plaintiff C. W. Schacht, ordered 100 shares of Socony Vacuum Oil Company stock at $18⅜ per share or $1837.50, plus $19.19 commission for defendants and $5.00 commission for Waddy making a total of $1861.69.

Prior to that time the said plaintiff had ordered other stock through Waddy and on September 15, 1948, Schacht settled his account through Waddy by taking credit for the market value of the other stock and paying the balance of $114.36 difference between the value of the former stock and the stock ordered on September 14, 1948. The stipulation says that Waddy did not execute this order through the defendants and there is no entry in BQ 10-012 subsequent to the date of the order to indicate that Waddy did execute the order.

Waddy has never accounted to said plaintiff for the said stock or the amount received by him from said plaintiff.

21. The immediate predecessor of the defendant partnership was the partnership of Fenner & Beane. Upon the organization of the defendants partnership, composed of Merrill Lynch & Pierce and Fenner & Beane, the same policies established by Fenner & Beane in their transactions were carried out by the new partnership, and while some of the transactions involved herein with the plaintiff, R. P. Hawkins, were had with Fenner & Beane, yet, no contention of

non-liability is made by the defendants on account of the date of the occurrence of those transactions.

22. While the written confirmation furnished by Waddy to each customer showed the amount of commission to be paid to the defendants for executing the order, as well as the amount of the commission received by Waddy for his part in the transactions, yet, the plaintiffs and each of them expected to receive stock certificates for stock ordered by them, and some of the plaintiffs on other and prior purchases had received stock certificates issued in their name from Mr. Waddy in accordance with such prior purchases, and all of the plaintiffs, except Mrs. Rose Goodman, inquired at intervals of Waddy as to why they had not received their stock certificates. They were told that the certificates were being held in New Orleans and that since most of them were trading from time to time that it would be more convenient to leave the stock certificates in New Orleans and thus save the expense of shipping and handling.

23. If a financial statement certified by a Certified Public Accountant had been filed yearly by Waddy, such statement would have disclosed to the Securities and Exchange Commission any discrepancies between the written confirmations given by him to his customers, including the plaintiffs, and the deposits made by Waddy in the banks for the defendants, or any discrepancies in the amount received by Waddy from the customers and deposited in his individual bank account, and by means of such certified financial statements any fraud on the part of Waddy upon the plaintiffs or other customers would have been avoided and prevented.

### Conclusions of Law

█ 1. The Court has jurisdiction of the parties and the subject matter of this cause. 28 U.S.C.A. § 1337; 15 U.S.C.A. § 78aa; Wright v. Securities and Exchange Commission, 2 Cir., 112 F.2d 89.

2. Was Waddy the agent of the partnership of Fenner & Beane, the immediate predecessors of defendants, prior to August 18, 1941, and of the defendants since said date?

The plaintiffs earnestly contend that Waddy was the general agent of defendants and as such possessed actual authority or at least apparent authority and that defendants are liable for his acts in the conduct of the business at Fort Smith.

█ The facts do not disclose any express contract of agency between the defendants and Waddy or that he possessed any actual authority to act as the agent of defendants, but if the defendants by acts or conduct knowingly caused or permitted Waddy to appear as their agent to the injury of plaintiffs and plaintiffs dealt with Waddy in good faith and in the exercise of reasonable prudence on their part the defendants are estopped to deny the agency. Agency by estoppel can be invoked by plaintiffs only if they knew and relied upon the conduct of the defendants.

█ The Supreme Court of Arkansas in most, if not all, of the cases decided by it on the question has considered the doctrine of apparent authority and the doctrine of estoppel as one and the same. In Ozark Mutual Life Association v. Dillard, 169 Ark. 136, 144, 273 S.W. 378, 381, the Court said:

"This court has often approved the statement of the law as to apparent authority announced in 2 C.J. 573, as follows: 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Pierce v. Fioretti, 140 Ark. 306–313, 215 S.W. 646, 648." The quotation was again cited with approval in Harris Hyman & Company v. Choctaw Cotton Oil Company, 179 Ark. 780, 785, 19 S.W.2d 1100.

█ The only actual authority that Waddy had was to use the private wire and cotton ticker furnished by defendants to transmit to defendants orders for the purchase or sale of stocks, bonds, securities or commodities and to collect for defend-

ants their commissions for the execution of the order. The plaintiffs paid Waddy a commission for his services at the time they placed their order or orders. The order was not placed by them with the defendants but only with Waddy. The defendants had the right under the law and rules and regulations of the exchanges to furnish the private wire and cotton ticker without their making Waddy their agent. Sec. 124, Meyer, The Law of Stock Brokers and Stock Exchanges. The plaintiffs were bound by such rules even though they did not have actual knowledge of them. 50 Am.Jur. sec. 22, page 642; see also, Annotation in 79 A.L.R. 592.

The plaintiffs are charged by law with knowledge of the meaning of the relationship of correspondent and carrying broker and cannot be heard to say that they thought the word "correspondent" meant agent. Krstovic v. Van Buren, 235 N.Y. 96, 138 N.E. 749.

The plaintiffs had no knowledge of the correspondence between Waddy and defendants taken from Waddy's file and introduced and could not have relied upon it as creating the relationship of principal and agent between the defendants and Waddy. The literature in the office of Waddy did not state that he was defendant's agent and Waddy did not tell any one that he was any more than a correspondent or wire connection.

The inter-office communications between Waddy and the defendants do not disclose the relationship of principal and agent in so far as plaintiffs are concerned or as between Waddy and defendants. In so far as the plaintiffs are concerned the competent testimony only reveals the legal relationship of correspondent or wire connection which is far short of the relationship of principal and agent, actual, apparent or implied, and the liability of defendants cannot be predicated upon such relationship.

The plaintiffs did have the right, under the law, to expect the defendants to control the actions of Waddy as a correspondent or wire connection and that such control would be in accordance with the law

and their orders would be executed in the manner provided by the law.

3. Are the defendants liable to these plaintiffs under the provisions of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78a et seq.?

It seems clear that a violation by one of the provisions of the Securities Exchange Act of 1934, supra, or the regulations promulgated thereunder, will give rise to a civil suit for damages on the part of one injured by that violation, and the defendants in the instant case do not contend to the contrary. See: 15 U.S.C.A. § 78aa; Kardon v. National Gypsum Company, D.C.E.D.Pa., 69 F.Supp. 512.

The provisions of the Securities Exchange Act of 1934, and the regulations promulgated thereunder, should be interpreted in the light of the end sought to be achieved and the evils to be prevented by the enactment of that legislation. In this manner only can full civil redress, within the contemplation of the Congress in enacting this legislation, be accorded one who has been injured as a result of a violation of the act. Certainly one such evil was the all too common participation of financially irresponsible persons in the brokerage business. Experience has taught that the inclinations of such persons in handling the money and securities of the investing public were such as to make supervision and regulation necessary. In the instant case that supervision and regulation was not applied to Waddy, with the result that members of the investing public suffered damage. The acts, conduct and advice of defendants in their transactions with Waddy and his compliance with such advice led directly to and caused the damage to the plaintiffs.

Plaintiffs contend that defendants have violated Section 78j of Title 15 U.S.C.A. That section provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(a) * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule X-10B-5 of the Securities & Exchange Commission provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) to employ any device, scheme, or artifice to defraud,

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

"in connection with the purchase or sale of any security."

Defendants permitted, and by virtue of their efforts in his behalf to enable him to retain account BQ 10-012, encouraged, Waddy to transact a large volume of business through BQ 10-012, with the knowledge that he was purchasing for others on an undisclosed basis and with knowledge of his limited resources. As the result of their experience in the brokerage field they knew the inherent dangers to the investing public of such a course of dealing. This is evidenced by the letter of Mr. Darwin S. Fenner addressed to Waddy under date of August 13, 1948, directing him to close the account. The loss suffered by all of the plaintiffs is the proximate result of the maintenance of account BQ 10-012, and the conduct of defendants in permitting the use of the account and in failing to properly supervise it paved the way for the losses suffered by these plain-

tiffs. But for the existence of this account, in the manner used by Waddy and the defendants, the defalcations on Waddy's part necessarily would have been ascertained long ago, and possibly, would never have occurred. The defendants in all probability prevented the S. E. C. from ascertaining the defalcations of Waddy by their letters advising him how to avoid the filing of a certified financial statement and how to execute and file other forms pertaining to the conduct of his business. Defendants should not and can not be allowed to disregard the rights of the public secured by the Securities Exchange Act of 1934.

In this regard, it is true that defendants finally attempted to close the account, and that the losses of certain of the plaintiffs occurred subsequent to the date of the letter, August 13, 1948, directing that it be closed. However, the damage had been done prior to that time, and the losses occurring subsequent thereto were the direct result of the course of conduct of defendants over the preceding years. Through the use of the BQ 10-012 account, permitted, approved and unsupervised by defendants, Waddy had already so involved himself that his subsequent misappropriation of the monies of these plaintiffs was but the proximate result of his prior defalcations and a last futile attempt to somehow juggle his accounts and prevent or at least delay the inevitable bringing to light of his defalcations.

Under Section 78j and Rule X-10B-5 defendants have engaged in a course of business the natural result of which operated as a fraud or deceit upon these plaintiffs.

In addition to and aside from the above, defendants are responsible for the violations by Waddy of Section 78j and Rule X-10B-5 by virtue of Section 78t of Title 15 U.S.C.A. Section 78t(a) provides:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, un-

less the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

The Court does not believe that in using the word "controls" the Congress intended that degree of control or the right to direct necessary to make out a common law relationship of principal-agent or employer-employee, but the fact that Waddy was not the agent of defendants, either actual or by estoppel, does not affect the statutory liability of defendants. Keeping in mind the end to be achieved by the legislation, the facts of the instant case, in the opinion of the Court, bring these defendants within the term "controls" as used in Section 78t (a).

As stated in Gulf Refining Co. v. Fox, D.C.S.D.W.Va., 11 F.Supp. 425, 430:

"Word 'control' has no legal or technical meaning, and [where used in statute] must be given such an interpretation as the Legislature intended it to have, to be ascertained from the connection in which it is used, the act in which it is found, and the legislation of which it forms a part."

The Congress believed, as is evidenced by this legislation, that the rights of the public could be adequately protected in this field of our economy only by extensive and rigid regulation and supervision, and when one, as did the defendants under the facts of this case, directs another in such a manner as to defeat the purposes of the legislation and violate the rights secured by the legislation, there exists that degree of control necessary to create liability under Section 78t(a).

The findings of fact, heretofore set forth, reflect that the defendants directed Waddy in the conduct of his business by furnishing him the wire, the cotton ticker, prescribing the form of accounts, prescribing the manner in which accounts, both segregated and BQ 10-012, were to be handled, furnished part of the forms for the transaction of his business, checked and approved his confirmation forms, made available the services of their research department to him and his customers, furnished market news and various publications pertaining to various industries, and particularly directed him in his compliance with the rules of the exchanges and through dictation of his replies to the S. E. C. enabled him to continue the use of BQ 10-012 to the injury of plaintiffs.

It is not sufficient to say that the only "control" exercised by the defendants was that necessary to assure compliance by Waddy with the rules of the New York Stock Exchange and the S. E. C., for those rules did not require defendants to misrepresent, through Waddy, the true facts concerning their operation with Waddy of account BQ 10-012. Quite the contrary, those rules required a full and accurate disclosure, and the effect of defendants control in this regard was sufficient, within the terms of Section 78t(a), to make them liable to these plaintiffs. When the public policy behind the enactment of this legislation is considered this result does not place too great a burden upon the defendants.

The provision of 78t(a) "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action" does not alter this conclusion, for under these facts defendants did directly or indirectly induce the acts constituting the violation.

Plaintiffs also rely upon Section 78k(d) of Title 15 U.S.C.A. That section provides, inter alia:

"It shall be unlawful * * * for any person who both as a broker and a dealer transacts a business in securities through the medium of a member or otherwise, to effect through the use of any facility of a national securities exchange or of the mails or of any means or instrumentality of interstate commerce, or otherwise in the case of a member, (1) * * * (2) any transaction with respect to any security (other than an exempted security) unless, if the transaction is with a customer, he discloses to such customer in writing at or before the completion of the transaction whether he is acting as a dealer for his own account, as a broker for such customer, or as a broker for some other person."

Waddy did not reveal to his customers, and specifically to these plaintiffs, the capacity in which he was dealing, either in writing or orally. He merely gave them confirmations of their orders. The account number, BQ 10-012 as to the plaintiffs, did appear on the confirmations but the significance of this was not explained to them. Defendants checked Waddy's method of confirming orders and specifically approved it. Their investigation was made at the request of an examiner of the New York Stock Exchange, and Waddy wrote them a letter in which he described the manner of handling segregated accounts and the BQ 10-012 account with confirmation forms covering both types of transactions enclosed. The only reasonable inference to be drawn is that had a full disclosure been made concerning the BQ 10-012 account plaintiffs would not have suffered the losses complained of.

■ The discussion pertaining to control previously made is applicable here, and suffice it to say that by virtue of Section 78t(a) defendants are liable for Waddy's violation of 78k(d).

■ Finally, plaintiffs contend that defendants are liable by virtue of Section 78t(a) because, through their control of Waddy in his replies to the S. E. C., that Commission did not require Waddy to file a certified financial statement. Rule X-17A-5 appears in finding No. 9 and will not be set forth here, but a certified financial statement is required when one is "holding securities owned by customers, except as an incident to transactions with or for customers which are promptly consummated by delivery".

Waddy held securities for his customers in account BQ 10-012 for considerable periods of time, including securities of two of the plaintiffs, R. P. Hawkins and J. K. Fraser, and such holding was not "as an incident to transactions with or for customers which are promptly consummated by delivery". In answer to an inquiry by the S. E. C. defendants advised Waddy to represent account BQ 10-012 as very small and carried for convenience, which Waddy did,

with the result that an uncertified financial report only was required. A certified financial statement, which in all probability would have been required had the true facts concerning account BQ 10-012 been revealed, would have brought to light the discrepancies in Waddy's records and would have prevented subsequent defalcations. Therefore, because of the control exercised by defendants in this regard, they are liable under section 78t(a), supra.

4. The defendant partnership is liable to the plaintiff, R. P. Hawkins, for the sum of $6140.10, the amount of money collected by Waddy from said plaintiff exclusive of the commission received by him.

■ This plaintiff may or may not, as he so desires, accept the 500 shares of United Corporation stock at its current market value and now in the possession of the defendant partnership, or he may reject said tender. Nakdimen v. Baker, 8 Cir., 111 F.2d 778, 781.

5. The defendant partnership is liable to the plaintiff, Rose Goodman, for the sum of $1806.00, being the amount of money paid by her to Waddy for the purchase of the stock and the commission of the defendant partnership.

6. The defendant partnership is liable to the plaintiff, J. K. Fraser, for the sum of $4179.02, being the amount of money collected by Waddy and deposited by him in the bank account of the defendant partnership.

As a payment on this amount the plaintiff, J. K. Fraser, may or may not, as he so desires, accept the 200 shares of Crown Drug Company stock. Nakdimen v. Baker, supra.

7. The defendant partnership is liable to the plaintiff, Raymond Allen, for the sum of $1777.51, the amount received by Waddy for the purchase of the stock including commission of the defendant partnership.

8. The defendant partnership is liable to the plaintiff, C. R. Sadler, for the sum of $887.00, being the amount received by Waddy for the purchase of stock including the commission of the defendant partnership.

9. The defendant partnership is liable to the plaintiff, C. W. Schacht, for the sum of $1856.69, being the amount of the purchase price of the stock including the commission of the defendant partnership received by Waddy.

10. Judgment in favor of the plaintiffs as hereinbefore set forth and against the defendant partnership will be entered for said amounts together with all costs.